JUDGE COTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'09 CIV 9256

---

DANIEL SMITH

Plaintiff,

**COMPLAINT**

-against-

**Jury Trial Demanded**

NEW YORK CITY DEPARTMENT OF EDUCATION, ED GARDELLA, CRAIG SHAPIRO, GERALDINE AMBROSIO, PATRICIA SQUIRE,

Defendants.

---X




Plaintiff, DANIEL SMITH, by and through his attorneys, Leeds Morelli & Brown, P.C., alleges, upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1. This is a civil action for compensatory and punitive damages proximately resulting from Defendants' violations of Plaintiff's rights, privileges and immunities as guaranteed him by the First, Fifth, and Fourteenth Amendments to the Constitution of the Unites States, 42 U.S.C. § 1983. This action is also brought based upon the Defendants' violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq. ("Title IX"); the New York State Executive Law, Human Rights Law, § 290 *et seq.*; New York City Administrative Code Title 8 and any other cause of action which can be inferred from the facts set forth herein.

2. The jurisdiction of this Court is invoked under 28 U.S.C. § 1331.

3. Venue is proper pursuant to 28 U.S.C. § 1391.

**PARTIES**

4. At all times hereinafter mentioned, Plaintiff, Dan Smith ("Dan"), was and is a resident of the County of Rockland, State of New York.

5. At all times hereinafter mentioned, Defendant, New York City Department of Education ("DOE") is the Policymaking body governing both schools by which Dan was employed.

6. At all times hereinafter mentioned, Defendant Geraldine Ambrosio ("Ambrosio") worked as the principal of Clinton High School located in the county of Bronx. Additionally, Ambrosio is a policymaker charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Ambrosio has the power to make personnel decisions regarding Plaintiff's employment.

7. At all times hereinafter mentioned, Defendant Ed Gardella ("Gardella") worked as the assistant principal in charge of physical education at Clinton High School located in the county of Bronx. Additionally, Gardella is a policymaker charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Gardella has the power to make personnel decisions regarding Plaintiff's employment.

8. At all times hereinafter mentioned, Defendant Craig Shapiro ("Shapiro"), was the principal of Grace Dodge High School located in the county of Bronx. Additionally, Shapiro is a policymaker charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Shapiro had the power to make personnel decisions regarding Plaintiff's employment.

9. At all times hereinafter mentioned, Defendant, Patricia Squire ("Squire"), was the assistant principal of Business Education at Grace Dodge High School located in the county of Bronx. Additionally, Squire is a policymaker charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Squire had the power to make personnel decisions regarding Plaintiff's employment.

**Background Facts**

10. Dan has continuously worked within the DOE, in various capacities, since 1985. In 1999 and again in 2001, the *Daily News* designated Dan as the Best Softball Coach in the Bronx. Dan was voted the Best Softball Coach in the Bronx again by his coaching peers in 2004, 2005, and 2006. The Umpire's Association of the Public School Athletic League voted Dan one of the Top Four Softball Coaches in all five boroughs of New York.

11. During the 1997-98 school year, while Dan was coaching football at Clinton, Dan spoke out, adamantly, against a racist and regional bias that he perceived in the boys' Public Schools Athletic League ("P.S.A.L.") football program. Dan complained of disparities in the hiring

of non-Caucasian referees, and the program's reluctance to hire referees from the Bronx and Manhattan for the football program. Dan also complained about statements he witnessed school personnel make while pointing at his players, to the effect of, "[y]ou will not lose to this element." These statements were included in Dan's complaints about the bias his players faced.

12. Following this complaint, the P.S.A.L. and the referees association began a policy of abusive officiating of Clinton games. Upon information and belief, pressure was placed upon the Clinton Administration which caused Gardella, who was both head coach of the football program and an administrator at Clinton, to seek a pretext to terminate Dan from his assistant football coaching position.

13. During the 1999 season, Dan was singled out and falsely accused of arguing and verbally abusing a referee. Gardella corroborated the false accusations against Dan to provide Ambrosio with grounds to terminate Dan. Ambrosio terminated Dan from his football coaching position based upon these false accusations. Although Dan was determined to be free of wrongdoing in arbitration, Dan was not allowed to return to his football coaching position.

14. Although removed from coaching football, Dan continued to teach physical education and coach women's softball at Clinton.

15. During the 2001-02 school year, Ambrosio and Gardella severely cut the budget of the softball program, which Dan coached. Dan complained, on numerous occasions both verbally and in writing, that the new budget for the softball program was inadequate and that the women's softball program received disparate funding when compared with boy's sports programs.

16. Also during the 2001-02 school year, Ambrosio and Gardella began to consistently discipline and issue formal written discipline against Dan. Prior to speaking out about the racist bias in the football program and the budget disparity between softball and baseball, Dan received only positive evaluations.

17. At the end of the 2001-02 Gardella observed a lesson Dan was presenting in order to perform an official observation of Dan's teaching. This was done abnormally late in the term. Prior to this observation, Dan had always received positive evaluations and ratings for his teaching. At the end of the lesson, Gardella indicated that Dan would not get a satisfactory rating for his performance.

18. Dan received the first unsatisfactory rating of his career for that lesson.

19. In response, Dan immediately filed a grievance seeking to overturn the unsatisfactory rating. At the first grievance stage, Ambrosio upheld the unsatisfactory rating. At the second stage of grievance, Borough Superintendent Norman Wechsler, a prior principal of Dewitt-Clinton

who had ties to Ambrosio and Gardella, also upheld the unsatisfactory rating. However, soon after learning that Dan escalated the process to a step 3 hearing. A step 3 hearing is reviewed at the main Department of Education offices. Shortly after Dan escalated the hearing to one reviewed by the main office, Gardella and Ambrosio issued Dan a satisfactory rating on his end-term rating sheet, effectively overturning the prior unsatisfactory rating by Gardella. By overturning the unsatisfactory raiting, Gardella and Ambrosio removed the need for Dan to pursue his grievance to the Departmental level.

20. Also in the 2001-02 school year, Dan was injured during a softball practice. Dan suffered severe injuries. Upon Doctors' advice not to return to work, Dan was granted Line of Duty Injury status ("LODI"). During the summer of 2002, Ambrosio and Gardella sought to revoke Dan's LODI status. Ambrosio and Gardella were successful in revoking Dan's LODI status, as such Dan received no salary for the 2002-03 school year, because he could not return to work on doctors' orders.

21. In September 2003, Dan returned to work and started in a teaching position at John F. Kennedy High School ("Kennedy") in Bronx County, New York. Dan retained his softball coaching position at Clinton. Ambrosio asked the principal of Kennedy, Anthony Rotunno ("Rotunno"), to pressure Dan to step down as softball coach at Clinton. Rotunno asked Dan to step down, but did not pressure him to do so.

22. Dan returned from his injury to coach softball in the 2003-04 school year. Despite his written requests and complaints to Ambrosio and Gardella, the softball budget continued to be severely cut by the Clinton administration. In subsequent years, the boys' baseball team received between $7,000 and $10,000 while the girls' team received only $300, a sum inadequate to even purchase sufficient softballs for the season. This budget disparity also affected the quality of program that Dan was able to provide his players and forced Dan to cut corners in his training. Dan made repeated complaints to the administration regarding the budget disparity between the mens' and women's programs.

23. In 2006, Dan donated $3,000 of his own money to the girls' softball program so that the program could continue to exist. Dan showed the students in the softball program, and eventually their parents as well, evidence of the budget disparity between the girls' program the and boys' program.

24. After working for some time at Kennedy, Dan found a position teaching physical education at Grace Dodge High School ("Dodge"), in the Bronx. Meanwhile, Dan continued to coach softball at Clinton.

25. For the 2005 football season, a new head coach, Howard Langley ("Langley"), was hired at Clinton. He was assured by Ambrosio that he could choose his own staff. However, when Langley offered Dan a football coaching position, Ambrosio blocked Dan from receiving the

paid position. Dan volunteered his time as a football coach while Langley pressured Ambrosio to allow Dan to hold the paid position.

26. At the onset of the 2006-07 school year, Gardella was promoted to borough head of security, a position that granted Gardella significantly more discretion and allowed him to interact intimately with the highest levels of the DOE administrators.

27. Throughout the 2006-07 school year, Dan repeatedly wrote requests for funding for the softball program. The Clinton administration ignored his requests and parents of softball players began to call and lodge complaints.

28. Throughout January and February 2007, the *Daily News* was investigating Title IX violations at Clinton. As part of their investigation the *Daily News* contacted the administration at Clinton with questions about the budget disparity. The Clinton administration refused to comment.

29. In early March 2007, Dan explained the budget disparity between the mens' and women's programs to New York State Assemblywoman Carmen Arroyo ("Assemblywoman Arroyo") in detail. Assemblywoman Arroyo then attempted to meet with Principal Ambrosio to speak about the budget disparity between womens' and mens' sports programs. Ambrosio did not make herself available to meet with Assemblywoman Arroyo.

30. On March 12, 2007, a student made false allegations against Dan, stating that he had approached herself and another female student while they sat on mats in the gymnasium and said to her, "I want you to sit on me, on my lap." The student alleged that these events took place on March 9, 2007, a date which school records show that the student was absent from Dan's physical education class.

31. At that time, no investigation was conducted by Shapiro or the Department of Special Investigations. The student was moved to the class of another gym teacher who taught in a shared gymnasium space with Dan. Dan was not separated from the student who made the allegations, and continued to teach in the same gymnasium where she attended her new physical education classes, thereby evidencing the falsity of the claims.

32. Chris Fink ("Fink"), another physical education teacher who witnessed the alleged events between Dan and the student, stated that the actual conversation occurred on a different day than alleged by the student. Fink stated that Dan said to the girl, "You're going to have a hard time passing. Take a lap and sit on your spot." Fink recalls the girl responding, "What? Do I have to sit on your lap?" Fink recalls Dan answering the girl, "No, I said take a lap and sit on your spot."

33. On Tuesday April 24, 2007, an article entitled "Grudge Match" appeared in the *Daily News* mentioning Dan in his capacity as a softball coach for speaking out about the lack of equipment provided to the girls' softball program at Clinton. In the article, Dan was quoted

describing the budget disparity as a violation of Title IX. Dan stated in the article that repeated budget requests were ignored by the administration. Based upon Dan's statements to his players, their parents and now the media, the parents of children in the Clinton softball program began to call the school and request additional funding and equipment for the program.

34. Shortly after the appearance of the April 2007 article detailing the Department of Education's Title IX violation in the *Daily News*, there was an attempt to discipline Dan, retroactively, for events that transpired months prior, in October 2006. It was alleged that Dan clocked in to coach after being absent from school during the day for a doctor appointment. This allegation was never raised prior to the April 2007 *Daily News* article. Coaches are allowed to coach their teams on days they are absent from their teaching position. However, no time clock was provided at Clinton, so Dan was not issued a time card to track the dates he worked. As such, at the end of the season, when Dan prepared his time slips, he was forced to do so without the aid of a time card. He made a clerical error, recording that he coached for pay on an evening when he was absent from teaching.

35. In fact, Dan had a surplus of days worked during that season and gained nothing by indicating that he worked on the day he was absent. It is mandated that time cards be provided for exactly this reason, coaches need to rely on them in order to properly record their time, months later, at the end of a season. It is common for coaches in the system to

make this clerical error, especially when the required time cards are not provided by the school.

36. Despite the common nature of this error, Dan was the only individual selectively prosecuted. The disciplinary charge was baseless, pretextual, and issued in retaliation for Dan's protected speech. None of Plaintiff's similarly-situated co-workers, who had not engaged in speaking out against the Title IX violation, were disciplined for similar errors.

37. Shortly after the appearance of the April 2007 *Daily News* article, an investigation of the allegations made by the female student was initiated through OSI. This investigation began more than a month after the student accused Dan, but very shortly after the appearance of the *Daily News* article, in which Dan criticized the DOE for violating Title IX. From the time the student made her allegation to the close of the school year, Dodge had made no effort to keep the student and Dan separate. Dan finished the school year as a teacher at Dodge. OSI has made no attempt to question Dan or any witnesses who were present beyond the girl who made the allegation and her friend, who was present with her at the time.

38. As an act of retaliation against Dan for speaking out about Title IX violations, OSI investigators deliberately chose not to interview Fink, even though they were aware that he was a witness to the events that occurred. Fink's account of events was not included in the Dodge principal's report, even though Fink had been interviewed by Principal Shapiro. Fink provided Shapiro with a written statement vindicating Dan. Investigators also failed to

question any students present in the gymnasium at the time the alleged statements would have taken place.

39. Upon returning to work at the Big Apple Games, on August 1, 2007, Dan was informed that his supervisor had experienced a problem inputting Dan's hours for his previous work as a softball coach for the games. Dan had been placed on the DOE's ineligible list without being told. Upon inquiring, Dan learned that he had been reassigned to the "rubber room" as a result of the female student's allegations and allegations that Dan had coached his football team on a day in which he was ill and did not report to his teaching position. Dan was out sick that day, but was then cleared by his doctor to return to work. The rubber room is a special waiting area where teachers are to report daily in order to await a Department of Education hearing.

40. This difficulty in inputting his hours has caused Dan to not be paid for two weeks of work he completed during the time in which he was not made aware that he had been reassigned to the rubber room. Dan has still not been paid for the hours he worked at the Big Apple Games prior to being made aware that he was on the DOE's ineligible list. Reassignment to the rubber room has left Dan ineligible to coach within the DOE system, in turn costing him income he regularly earned by coaching in years prior.

41. Dan languished in the rubber room without being charged from August 1, 2007 until May 2008. Dan was not charged and, as such, could not clear his name. Instead, he was forced

to await being charged indefinitely. Upon information and belief, Defendants' actions in placing Dan in the rubber room, despite clear evidence that he was not guilty of improper conduct, and then delaying the proffering of charges against him for an entire school year, was done in retaliation for his engaging in protected speech.

42. In April 2008, a second, full page, article entitled, "Clinton coach slams ban" appeared in the *Daily News* chronicling Dan's plight in being sentenced to the rubber room without being charged and recounting his complaint against the disparity in funding that the womens' softball program experienced at Clinton. In the article, Dan also commented that he believed the charges against him were retaliation for speaking out about the Title IX violation perpetrated against his softball team when it is regularly assigned disparate and inadequate funding.

43. Less than one month after the April 2008 article was released, after a full nine months of waiting uncharged in the rubber room, Dan was finally charged. Dan was charged with (1) sexual harassment allegations levied against him by a student who was absent on the day she claims to have been harassed; (2) with coaching a team on a day in which he utilized sick time for a doctor's appointment; and, (3) for receiving an unsatisfactory rating from his supervisor. These charges were false and unfounded, and were a pretext in retaliation for speaking out about a matter of public concern.

44. Dan reported to the rubber room in the Bronx to await hearing. Since then, Dan has been transferred to several different rubber rooms in different locations within the DOE. Dan continues to languish in the rubber room to this day, still awaiting his hearing.

45. As a direct and proximate result of the aforementioned retaliation, Plaintiff was caused to suffer loss of earnings, accrued benefits, in addition to suffering great pain, humiliation, as well as physical and emotional damages.

## CLAIMS FOR RELIEF

46. Based upon the foregoing, Defendants have taken various adverse employment actions and have created an atmosphere of adverse action against Plaintiff as retaliation for Plaintiff's speech about a matter of public concern and his opposition to discriminatory practices.

47. The aforementioned acts constitute retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq. Dan engaged in an activity protected by Title IX by opposing a practice made unlawful by Title IX. His employer was aware of that activity. Shortly after Dan's opposition to the unlawful practice, Dan suffered a series of adverse employment actions which were causally connected, as acts of retaliation, to his opposition of the unlawful practices.

48. The aforementioned acts constitute unlawful discrimination and retaliation in violation of the New York State Human Rights Law, Executive Law § 296 et seq., the New York City

Human Rights Law, N.Y.C. Admin. Code § 8-107(7), and any other causes of action which can be inferred from the facts set forth herein.

49. Defendants have, while acting under color of state law, deprived plaintiff of his constitutional rights, as secured by the First and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983, and all related provisions of the New York State Constitution. Defendants intentionally committed, condoned or were deliberately indifferent to the aforementioned violations of plaintiff's constitutional rights. Such deliberate indifference may be inferred in the following ways:

a. Defendants' custom or practice of discriminating and/or retaliating against plaintiff based on his constitutionally-protected forms of speech, expression and association. The discriminatory practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers.

b. Supervisors failed to properly investigate and address allegations of retaliation and/or harassment.

c. Inadequate training/supervision was so likely to result in the retaliation, and/or harassment that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision.

d. Policymakers engaged in and/or tacitly condoned the retaliation.

**CAUSES OF ACTION**
**AGAINST THE INDIVIDUAL DEFENDANTS**

48. The individual defendants unlawfully participated in and/or permitted the aforementioned harassment and/or retaliation to perpetuate, without abatement, in violation of plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

49. Individual Defendants aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of New York State Executive Law § 296, and New York City Human Rights Law, N.Y.C. Admin. Code Title 8.

WHEREFORE, Plaintiff demands judgment against all Defendants in the form of and/or for compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, interest, injunctive relief, and any other damages permitted by law. Plaintiff also demands judgment against defendants for each cause action and for all applicable and permissible damages, in an amount to be assessed at the time of trial. The plaintiff further seeks injunctive relief, including but not limited to a permanent injunction enjoining all Defendants and their agents from any further actions abridging Plaintiff's rights. Plaintiff further demands all attorneys' fees, disbursements and other costs and all further relief, equitable or otherwise, to which Plaintiff is entitled and/or which the court deems just and proper.

Dated: Carle Place, New York

October 30, 2009

Respectfully submitted,

LEEDS MORELLI & BROWN, PC
Attorneys for Plaintiff
One Old Country Road,
Suite 347
Carle Place, New York 11514
(516) 873-9550

THOMAS RICOTTA (TR-1900)